UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-81090-CIV-HURLEY

THE WACKENHUT CORPORATION,
    plaintiff,

vs.

**CLOSED CASE**

SERVICE EMPLOYEES INTERNATIONAL UNION,
    defendant.
_____/

MEMORANDUM OPINION AND ORDER
GRANTING DEFENDANT'S MOTION TO DISMISS
& FINAL ORDER OF DISMISSAL WITH PREJUDICE

**THIS CAUSE** is before the court on the defendant's motion to dismiss for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) [DE# 14]. For reasons discussed below, the court has determined to grant the motion and dismiss the plaintiff's complaint with prejudice.

### I. Factual Background[1]

Plaintiff The Wackenhut Corporation ("Wackenhut") is a Florida corporation headquartered in Palm Beach Gardens, Florida. Employing approximately 32,000 security officers, Wackenhut is a leading provider of security services to government agencies and private industrial and commercial customers throughout the United States.

The defendant Service Employees International Union ("SEIU") is an international labor union headquartered in Washington, D.C.. It is a "mixed" union, admitting approximately 1.9

---

[1]The recited facts are drawn from the plaintiff's complaint [DE# 1] and are presumed to be true for purposes of this motion.

1

million members throughout North America, including health care workers, public service employees, and property service employees (janitors, doormen) as well as private sector security guards.

In October 2003, SEIU allegedly launched a corporate campaign to "strong arm Wackenhut into signing labor agreements to which SEIU has no legal right." [Complaint¶ 7]. Wackenhut alleges that SEIU aggressively pursued this campaign through "economic, political and psychological warfare," including "a continual barrage of anti-Wackenhut flyers, newsletters, website publications, public demonstrations and political maneuvering," all in effort to coerce Wackenhut into negotiating a labor agreement with SEIU. [Complaint ¶¶ 2, 6, 8].

Wackenhut asserts that this "extortionate campaign" is SEIU's only option in the security guard industry due to SEIU's status as a "mixed union," representing security and non-security officers alike, a status which prevents it from forcing Wackenhut to the bargaining table under federal law. Instead, the only way it can represent Wackenhut's security officers in the collective bargaining process is by voluntary recognition [Complaint, p 8]. [2] Confronted with Wackenhut's refusal to recognize it, SEIU allegedly waged a "campaign of extortion designed to coerce [Wackenhut's] consent," prompted by a desire to "maximize its membership and thus its income from dues and fees."

The specific acts alleged to have been committed by SEIU in furtherance of this campaign, which the complaint breaks down into "phases," are summarized in the numbered paragraphs below.

---

[2] The National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(3), permits a union to become a collective bargaining representative for an employer's employees if the union prevails in an election certified by the National Labor Relations Board (NLRB). The NLRA also permits an employer, under certain circumstances, to voluntarily recognize a union. 29 U.S.C. §158(a)(3)(2008).

2

### 1. Anti-Wackenhut Campaign: October 2003 through March 2004

SEIU allegedly launched its "campaign of coercion" in October 2003 with a public forum in which European labor unions criticized Wackenhut's European parent corporation. At the same time, SEIU began operating "eyeonwackenhut.com," a website via which it allegedly published false and misleading reports disparaging Wackenhut and some of its national customers, and began distributing "EyeOnWackenhut" newsletters and anti-Wackenhut flyers to Wackenhut customers. [Complaint, ¶ 32].

In November 2003, senior executives of SEIU and Wackenhut met in South Florida for discussions, and on November 26, 2003, SEIU sent Wackenhut a proposed settlement agreement that mirrored one it had previously negotiated with one of Wackenhut's major competitors, Securitas Security Services USA, Inc. Following another series of senior level discussions in December, 2003, the discussions broke off. [Complaint ¶¶33-35].

Shortly after, in February 2004, SEIU allegedly announced that it was "relaunching" its "campaign of coercion" against Wackenhut [Complaint ¶36], and in March, 2004, it allegedly joined forces with Prewitt Organizing Fund (Prewitt") to develop a plan to pressure Wackenhut through disparagement and harassment, a plan that ultimately evolved into the "PROTECTS" project. [Complaint ¶39].

### 2. The "PROTECTS" Phase: March 2004-May 2005

Prewitt, which did traditional employee organizing work for SEIU in the past, allegedly worked behind the scenes to create an organization purporting to be a grass roots citizens group with an interest in national security, but which in fact was a "shell" established to promote SEIU's anti-Wackenhut public campaign. It was thus Prewitt's stated goal, "by publicity and

3

appeals to major Wackenhut clients," to persuade "stakeholders to use their influence with Wackenhut to persuade the company to follow the Securitas example and cooperate with SEIU...." [Complaint ¶39].[3]

SEIU and Prewitt allegedly sought to conceal their roles in this campaign due to perceived credibility issues attendant to their union ties, and therefore chose to operate behind a shell organization created by Prewitt, "People for Responsible Outsourcing to End Excessive Costs to Stockholders," or "PROTECTS." [An acronym in which the word "stockholders" was eventually changed to "stakeholders."]. PROTECTS entities were then allegedly used to harass and unfairly disparage Wackenhut with "dozens of demonstrations at facilities of Wackenhut customers, at board of director meetings, shareholder meetings and other gatherings." [Complaint ¶ 45]

In addition, SEIU allegedly used PROTECTS entities to make a series of false statements about Wackenhut designed to shake public confidence in its ability to provide security to America's large corporations after the September 11, 2001 tragedy. For example, PROTECTS allegedly made the following accusations in flyers and other media distributions:

- "Wackenhut is currently under federal investigation for ... poorly maintained weapons inventories."

---

[3]For example, in an email generated by senior Prewitt staff member Megan Park on August 9, 2004, Prewitt outlined a plan to "get Wackenhut to the table" by :
(1) "A leafleting event in front of an office or retail establishment of the national client ....The more visibility the better..."
(2) "[I]nside activity," such as "delivery of a press release/letter or award delivered inside the building directly to management,"....
(4) Outside "attention getting devise[s]," including at least three of the following: costumes, banner...sandwich board signs, wall of shame, puppets, picket signs, bull horns..."
[Complaint ¶ 41].

4

- "Wackenhut is currently under federal investigation for ... inappropriate storage of explosives."
- "Wackenhut is currently under federal investigation for ... falsified weapons tests."
- "Wackenhut is currently under federal investigation for ... falsified drug screening[s]."
- "Wackenhut failed to keep mob bosses from sensitive premises."
- "Wackenhut is implicated in bank robbery."
- "Wackenhut is implicated in... chronic drug abuse."

[Complaint ¶ 46]

The "PROTECTS" phase of the campaign allegedly ended in May 2005, after Wackenhut filed a complaint with the NLRB and a settlement agreement was reached requiring SEIU to terminate its support of PROTECTS demonstrations at facilities of Wackenhut customers. [Complaint ¶ 47].

### 3. "Campaign of Extortion": May 2005

The "campaign of coercion" allegedly mutated into a "campaign of attempted extortion" in May, 2005, after Wackenhut lost its contract with Quest Communications International, Inc. (QUEST), a loss it attributed to the success of SEIU's anti- Wackenhut campaign. At that point, Wackenhut became fearful that "SEIU had the power to affect its ability to obtain and maintain security services contracts" [Complaint ¶ 48], and recognized that SEIU intended to "continuously threaten[] to disparage Wackenhut to the world, and otherwise to harass Wackenhut, until Wackenhut accedes to its demands." [Complaint ¶ 49].

SEIU allegedly then became "more sophisticated and more effective in its efforts to undermine the relationship between Wackenhut and its stakeholders," supplanting its earlier

PROTECTS project efforts with a relentless campaign of false, misleading, and disparaging advocacy." [Complaint ¶ 56]. More specifically, SEIU allegedly began flooding stakeholders with false and disparaging communications via mail, fax, websites, newsletters, newspaper advertisements, fake annual reports, and anti-Wackenhut letters sent to investors and stock analysts. [Complaint ¶¶ 57, 59]. In addition, it allegedly enlisted the aid of numerous politicians, including several in South Florida, who in turn "responded by making statements or writing letters that criticized Wackenhut for its refusal to recognize SEIU," sending the message that "SEIU has the power to influence politicians" and that "SEIU will continue to exercise its political clout until Wackenhut bends to SEIU's will." [Complaint ¶ 58].

Through this alleged "extortionate" corporate campaign designed to "convince the world that Wackenhut is not a responsible provider of security services" [Complaint ¶ 60], SEIU allegedly caused Wackenhut to lose multiple contracts and business opportunities and suffer loss of business reputation. [Complaint ¶ 62]

In May 2005, SEIU allegedly turned up the heat another notch and began using Prewitt to investigate Wackenhut's compliance with federal laws, regulations and government contract requirements, to funnel data collected in this investigation to Congress, to assist security guards with employment related or "whistle blower" complaints against Wackenhut, and to recruit and hire workers to support SEIU's extortionate anti-Wackenhut campaign. [Complaint ¶ 66].

**4. The South Florida Connection**

In South Florida, SEIU allegedly worked to disrupt Wackenhut's key contracts with state departments and agencies located in Broward and Miami-Dade Counties. Thus, in June 2004, SEIU allegedly wrote an anti-Wackenhut letter to Broward County officials, distributed negative flyers

at the Broward County courthouse, picketed Broward County Commission meetings and mailed postcards to Broward County residents urging them to call for the termination of Wackenhut's contract with the County. SEIU allegedly pursued a similar campaign in Miami, Florida in February, 2005. [Complaint ¶67].

In January 2007, SEIU retained Pamela Kieffer, an experienced union campaign consultant, to manage its anti-Wackenhut campaign in South Florida. Kieffer allegedly arranged for numerous contacts with South Florida government officials for the purpose of furthering SEIU's anti-Wackenhut "extortionate" campaign, and organized several anti-Wackenhut events at the Broward County Convention Center and Courthouse in Miami Florida, with members of SEIU's local union in Miami in attendance. [Complaint ¶69]. In one celebrated example, Kieffer allegedly staged a street theater in Miami Florida in July 2007 to publicize allegations of "unfounded allegations of overbilling" on Wackenhut's Miami-Dade county contract. [ Complaint ¶70]. A video of the event later appeared on YouTube showing a man carrying a briefcase labeled "Wackenhut," which was supposedly stuffed with money that Wackenhut improperly received from the Miami-Dade contract. The man is shown running through the streets of Miami in slow motion, chased by "local activists" carrying large pairs of eyes and big pointer fingers, with signs disparaging Wackenhut and directing viewers to go to "eyeonwackenhut.org" for more information. [Complaint ¶70].

In August 2007, Kieffer infiltrated a Palm Beach County Business Development Board (BDB) meeting attended by major Wackenhut customers at the PGA National Resort in Palm Beach Gardens, Florida by sending organizers into the kitchen pretending to have authorized access. The organizers then took two food carts and wheeled them into the event room, where they released

balloons printed with anti-Wackenhut messages, and delivered a cake decorated with two large eyeballs and script reading "Where's Our $ 12.1 Million? We're Watching You." [Complaint ¶ 71].

In September 2007, Kieffer allegedly infiltrated a black tie gala event at the Kravis Center in West Palm Beach, where planted organizers placed professionally printed tent cards at approximately 400 place settings engraved with the words "thank you" on the outside, and anti-Wackenhut statements printed on the inside. [Complaint ¶72].

Characterizing these acts as "an implicit threat that SEIU would continue its economically damaging campaign until Wackenhut signs the agreements that SEIU demands," Wackenhut charges SEIU with "attempt[ing] to obtain property from Wackenhut through the wrongful use of threats of economic fear," effective acts of "attempted extortion" in violation of 18 U.S.C. § § 1951. [Complaint ¶ 104].

## II. Procedural Background

On November 1, 2007, Wackenhut filed suit against SEIU in the Southern District of New York, asserting the same claims based on the same allegations as those advanced in the instant case. *Wackenhut v SEIU*, Case NO. 7-9703 (S.D.N.Y. 2007). After the New York district court issued an order directing the parties to show cause why the case should not be transferred to the United States District Court for the District of Columbia, Wackenhut voluntarily dismissed that action without prejudice pursuant to Fed. R. Civ. P. 41(a), and, on the next day, November 16, 2007, re-filed its complaint in this court.

In Count 1 of its current complaint, Wackenhut asserts a violation of § 1962 (c) of the Racketeer Influenced and Corrupt Organizations Act (RICO) based on a pattern of racketeering

activity allegedly derived from multiple acts of attempted extortion and violations of the Travel Act. In Count 2, it asserts a violation of § 1962(d) of the Racketeer Influenced and Corrupt Organizations Act based participation in an alleged conspiracy to conduct the affairs of the anti-Wackenhut enterprise through a pattern of racketeering activity, namely, multiple acts of attempted extortion.

SEIU argues that the complaint fails to state a RICO claim because the facts alleged do not constitute acts of extortion as defined by the Hobbs Act. It further contends that the Complaint fails to establish a "pattern" of racketeering activity. Accordingly, it argues that the plaintiff's federal RICO claims must be dismissed with prejudice.

For reasons more particularly discussed below, the court agrees that the Complaint does not allege facts constituting acts of "extortion" as that crime is defined under the Hobbs Act, and that the Complaint is necessarily dismissed for failure to state a claim on this basis, rendering it unnecessary to reach the defendant's remaining challenges to the Complaint.

### III. Standard of Review

In reviewing a Rule 12(b)(b)(6) motion, the court must accept as true all of the factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Young Apartments, Inc. v Town of Jupiter, Florida*, 529 F.3d 1027 (11th Cir. 2008). A motion to dismiss does not test the merits of a case, but only requires that "the plaintiff's factual allegations, when assumed to be true, 'must be enough to raise a right to relief above the speculative level.'" *Id.*, quoting *Bell Atlantic Corp v Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965, 167 L.Ed.2d 929 (2007). Accordingly, a complaint will survive a Rule 12(b)(6) motion to dismiss only if it sets forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

9

## IV. Discussion

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* establishes civil and criminal liability for those who engage in "a pattern of racketeering activity." 18 U.S.C. § 1962. To state a RICO claim, a plaintiff must allege the following elements: (1) the defendant's employment by or association with (2) an 'enterprise' (3) engaged in or affecting interstate commerce (4) the affairs of which the defendant conducts or participates in through a pattern of racketeering activity. *Dtex, LLC v BBVA Bancomer, S.A.,* 405 F. Supp.2d 639, 649 (D. S. C. 2005), *aff'd,* 214 Fed Appx. 286 (4th Cir. 2007).

A "pattern of racketeering" requires at least two acts of "racketeering activity" committed within ten years of each other. 18 U.S.C. § 1961(5). The Act defines "racketeering activity" as "any act or threat involving," among other things, certain criminal offenses under federal and state law, including the crime of extortion under the Hobbs Act, 18 U.S.C. §1951. See U.S.C. §1961(1).

In this case, the predicate acts alleged are attempted extortion under the Hobbs Act and subsidiary violations of the Travel Act.[4]

A person violates the Hobbs Act where he or she "obstructs, delays, or affects commerce ... by robbery or extortion or attempts or conspires to do so." 18 U.S.C. § 1951(a). Extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of

---

[4] The Travel Act, in relevant part, prohibits the use of "any facility in interstate commerce" to "carry on, or facilitate...any unlawful activity," which is defined to include certain specified crimes, including "extortion..." Here, Wackenhut alleges a violation of the Travel Act through SEIU's use of email messages to promote, manage, establish and carry on the attempted extortion of Wackenhut. Thus, the "unlawful activity" on which the Travel Act claim is premised is the alleged Hobbs Act extortion violation, and the viability of the Travel Act claim necessarily hinges on the viability of the Hobbs Act claim.

actual or threatened force, violence, or fear, or under the color of official right. *Id.*

Until recently, the phrase "the obtaining of property from another" as found in the Hobbs Act was construed broadly by the courts, with the term "property" interpreted to include intangible as well as tangible property rights. *United States v Santoni,* 585 F.2d 667, 673 (4th Cir. 1978)(recognizing intangible right "to make a business decision free from outside pressure wrongfully imposed" as property within meaning of Hobbs Act), *cert. den.*, 440 U.S. 910, 99 S. Ct. 1221, 59 L.Ed.2d 459 (1999); *United States v Tropiano,* 418 F.2d 1069, 1075-76 (2d Cir. 1969), *cert. den.*, 397 U.S. 1021, 90 S. Ct. 1258, 25 L.Ed. 2d 530 (1970)(recognizing intangible right to solicit business free of wrongfully imposed territorial restrictions as "property" under Hobbs Act); *United States v Bellomo,* 176 F.3d 580, 592-93 (2d Cir. 1999)(recognizing right of union members to participate in union election as "property" under Hobbs Act), *cert. denied sub nom., Ida v United States,* 528 U.S. 987, 120 S. Ct. 447, 145 L.Ed.2d 364 (1999).

Similarly, the term "obtaining" was broadly construed to encompass acts constituting interference with or deprivation of a person's property rights, even if the defendant did not seek to exercise those rights for itself. *See e.g. United States v Arena,* 180 F.3d 380, 394 (2d Cir. 1999)(in case involving anti-abortion protestors who attempted to shut down clinic, "obtaining" element was satisfied where defendant committed or threatened acts of violence and harm in order to induce victim to abandon its right to conduct business free from threats of violence and harm).

However, the United States Supreme Court significantly restricted the scope of the phrase "the obtaining the property from another" in *Scheidler v National Organization for Women, Inc.,* 537 U.S. 393, 123 S. Ct. 1057, 154 L.Ed. 2d 991 (2003). In *Scheidler,* the Court assessed facts similar to those in *Arena,* to wit, anti-abortion protestors who were attempting to shut down abortion

clinics. Confronted with the question of whether the actions of the anti-abortion protestors preventing access to the clinics, causing property damage and committing criminal trespass could constitute extortion and thus a predicate act under RICO, the Court said no, explaining:

> [E]ven when their acts of interference and disruption achieved their ultimate goal of "shutting down" a clinic that performed abortions, such acts did not constitute extortion because petitioners did not "obtain" respondents' property. Petitioners may have deprived or sough to deprive respondents of their alleged property right to exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received "something of value from" respondents that they could exercise, transfer or sell. To conclude that such actions constituted extortion would effectively discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion.

*Schiedler*, 537 U.S. at 404-405, 123 S. Ct. at 1065-66.

*Scheidler* thus makes clear that it is not enough to show merely that there was a deprivation or interference with the plaintiff's property right. Rather, in order to show that a property right was "obtained," there must be both a deprivation *and* acquisition of the property. *United States v Gotti*, 459 F.3d 296 (2d Cir. 2006)(mere interference with right to conduct business, even to point of causing cessation of business, is closer to coercion than extortion).

In this case, Wackenhut asserts that SEIU is attempting to "bend its will" and obtain from it various intangible property rights, including Wackenhut's right to control the form and nature of the union recognition process that applies to its employees; Wackenhut's right to refuse demands for recognition from a "mixed union" such as SEIU; Wackenhut's right to decline collective bargaining with SEIU; Wackenhut's right to preserve its employees' statutory right to "free choice," and Wackenhut's right to conduct business with its customers free from

interference, harassment and threats of economic doom from SEIU or its agents.

The court agrees that these allegations satisfy the "property" prong of the Hobbs Act. However, it finds that the allegations fall short of satisfying the "obtaining" prong of the extortion statute. Wackenhut does not allege that SEIU obtained any of Wackenhut's rights or property; at most, it claims that SEIU improperly coerced or attempted to coerce it to do something to which it was not otherwise inclined or required to do. But coercion, as the Supreme Court observed in *Scheidler*, is not extortion, and it is not a violation of the Hobbs Act. *Id* at 407-08. Thus, SEIU may have attempted to coerce Wackenhut, but it has not attempted to obtain Wackenhut's property.

Wackenhut suggests that it is sufficient that SEIU put it in fear of economic loss. While fear or economic loss does satisfy the requirement that defendant induce "by wrongful use of threatened force, violence or fear," Wackenhut does not go on to allege that SEIU was then able to obtain Wackenhut's property as a result of inducing that fear. Wackenhut apparently seeks to circumvent this impediment by suggesting that SEIU's "anti-Wackenhut campaign" has caused it to lose major customers. However, even if SEIU's actions did interfere with Wackenhut's business relations with third parties and cause Wackenhut to lose existing or expected customers, SEIU obtained none of Wackenhut's property as a result.

Thus, even assuming the truth of Wackenhut's allegations -- that the defendant sought to exert economic pressure on Wackenhut to force it to accede to its demand for recognition and in doing so interfered with its right to conduct its business, even to the point of causing it to lose customers -- such allegations merely establish that the defendant sought to deprive Wackenhut of these property rights, not that it sought to acquire them for itself. Without an allegation that the

defendant sought to acquire these rights, the complaint fails to allege facts from which the court might conclude that SEIU "pursued or received something of value from [Wackenhut] that [it] could exercise, transfer, or sell." *Scheidler* at 405, 123 S. Ct. at 1066. *See e.g. Roman Restoration, Inc. v Operative Plasterers' and Cement Masons' International Ass'n of the United States and Canada Local #8*, 2008 WL 2684350 (D. N. J. 2008)(unpub); *US Airline Pilots Ass'n v AWAPPA*, LLC, 2008 WL 2761388 (W.D. N.C. 2008)(unpub).

The court concludes that because Wackenhut does not allege that SEIU obtained any of its property, it fails to state a violation of the Hobbs Act or Travel Act. Without any properly pled predicate acts, Wackenhut's RICO claims must be dismissed.

### V. Conclusion

Based on the foregoing, it is **ORDERED AND ADJUDGED**:

1. The defendant's motion to dismiss [DE# 14] is **GRANTED**, and Plaintiff's Complaint is **DISMISSED WITH PREJUDICE** pursuant to Fed. R. Civ. P. 12(b)(6).

2. There being nothing further for the court to do, the Clerk of Court is directed to **CLOSE** this file and terminate any other pending motions as **MOOT**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this _4th_ day of December, 2008.

_____
Daniel T. K. Hurley
United States District Judge

cc. All counsel

For updated court information, visit unofficial Web site at http://us.geocities.com/uscts